UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| WANDA M. NORIEGA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:04-CV-00057 |
| | ) | |
| BRC RUBBER GROUP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>OPINION AND ORDER</u>

**I. INTRODUCTION**

Plaintiff Wanda M. Noriega brings this suit against Defendant BRC Rubber Group, Inc., and Defendant BRC Rubber & Plastics, Inc. (together referred to herein as "BRC"), alleging that BRC (1) discriminated against her because of her Hispanic national origin, and then retaliated against her, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and 42 U.S.C. § 1981; (2) discriminated against her because of a disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*; and (3) retaliated against her because she exercised her rights to worker's compensation following a work-related injury, in violation of the tort laws and public policies of the State of Indiana.[1] (Pl.'s First Am. Compl. ("Am. Compl.") ¶¶ 2, 4, 5.)

BRC moves for summary judgment on all of Noriega's claims. (Docket # 30.)  Based

_____

[1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

upon the evidence of record, there is no material dispute of fact that requires a trial; therefore, BRC's motion will be GRANTED with respect to all of Noriega's claims arising under federal law.

## II. FACTS AND PROCEDURAL HISTORY[2]

BRC, a manufacturer of molded rubber and plastic components for automotive and industrial applications, hired Noriega, who is of Hispanic national origin, on October 14, 2002, to work as an Injection Press Operator at BRC's Churubusco plant. (Aff. of Jack Urhausen ¶ 7; Aff. of Misha Myers ¶ 6.)  An Injection Press Operator loads and monitors the operation of an injection molding machine (referred to as a "press" by BRC), a machine that converts raw rubber or plastic compounds into finished parts through a temperature-controlled injection molding process. (Urhausen Aff. ¶ 8.)  A press needs to be closely monitored because if its temperature drops, it typically takes an hour to bring it back up, losing valuable production in the process. (*Id*. ¶ 9.)

On May 14, 2003, Noriega was assigned to run a press equipped with a "stuffer," a chamber into which an operator loads raw rubber or plastic compound packets. (*Id*. ¶ 11.)  While operating the press, Noriega bent over to take out a heavy packet of compound to load into the stuffer when she heard her back snap. (Aff. of Wanda Noriega ¶ 3.)  She promptly reported the injury to her supervisor, Jack Urhausen, who then reported the incident to BRC's Human Resources Manager, Misha Myers. (*Id*. ¶ 4; Urhausen Aff. ¶¶ 17, 18.)  Myers, who is fluent in both English and Spanish, spoke with Noriega regarding the injury and ultimately drove her to

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Noriega, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

RediMed in Fort Wayne for examination.[3] (Urhausen Aff. ¶ 18; Myers Aff. ¶¶ 8, 10.)  Both

Urhausen and Myers completed reports promptly after the incident, with Myers later filing the

necessary documents to report Noriega's injury to BRC's worker's compensation carrier.

(Urhausen Aff. ¶¶ 17, 18; Myers Aff. ¶ 9; Def.'s Mot. for Summ. J., Exs. 2, 4.)

     Once at RediMed, Dr. Larry Rowe diagnosed Noriega with a low back strain and excused

her from working for the balance of the shift. (Myers Aff. ¶ 12; Noriega Aff. ¶ 6; Def.'s Mot. for

Summ. J., Ex. 5.)  Dr. Rowe did, however, release Noriega to return to work the next day with

the following restrictions: lifting of ten pounds or less only occasionally, no lifting over eleven

pounds, no bending, only occasional squatting or kneeling, no climbing ladders, no working

aloft, and no pushing or pulling. (Def.'s Mot. for Summ. J., Ex. 5.)

     Noriega returned to work the following day and was given a light duty assignment as a

"Finisher." (Noriega Aff. ¶ 6.)  A Finisher inspects, finishes, and trims excess rubber from the

product and then gathers the finished products for shipment. (Urhausen Aff. ¶ 10.)  In keeping

with BRC's applicable policy and practice, Noriega's rate of pay was adjusted downward to the

rate established for other Finishers, and BRC's worker's compensation carrier partially

reimbursed her for the difference between her regular job rate and the light duty job rate. (Myers

Aff. ¶¶ 13, 14.)

     However, shortly after Noriega's temporary reassignment, the Finishing area encountered

a shortage of work, causing BRC to reduce Noriega's hours by approximately one workday in

---

[3]Apparently, BRC employs "[a] wide variety of individuals of differing nationalities," including those of
Hispanic, Bosnian, Croatian, Vietnamese, Burmese, and Iraqi descent. (Myers Aff. ¶ 18.)  Accordingly, BRC retains
a Human Resources Manager and a worker's compensation physician who are fluent in both Spanish and English,
and offers its employee manual in Spanish and English. (Id. ¶ 11; Def.'s Mot. for Summ. J. Exs. 24, 35.)

3

each of the next two weeks. (Def.'s Mot. for Summ. J., Exs. 19, 20.)  Apparently because of a

concern about a shortage of work in the Finishing area, on June 2, 2003, Noriega misrepresented

to Urhausen that she had been released by Dr. Rowe to return to her regular job as an Injection

Press Operator. (Myers Aff. ¶ 15; Def.'s Mot. for Summ. J., Ex. 9.)  Urhausen assigned her to a

press and then checked with Myers to verify that Dr. Rowe had indeed sent a written release.

(Myers Aff. ¶ 15.)  When Myers reviewed the slip from Noriega's recent doctor's appointment,

she found that Dr. Rowe had actually *extended* Noriega's restrictions, not removed them. (*Id.*;

Def.'s Mot. for Summ. J., Ex. 9.)  Therefore, Urhausen sent Noriega back to the Finishing area to

continue light duty work.

The Finishing area, however, did not have a sufficient quantity of work to sustain its

employees. (Myers Aff. ¶ 15.)  Thus, BRC implemented a temporary reduction in force within its

Finishing area pursuant to its policy articulated in BRC's employee handbook, which states that

"[e]mployees will be released on the basis of seniority within [a] classification or department."[4]

(Def.'s Mot. for Summ. J., Ex. 23 at 20; *see also* Myers Aff. ¶ 16; Aff. of Thomas Maher ¶ 9.)

Considering the seniority of all of the employees in the Finishing area, BRC laid off Noriega,

who had the least seniority as a Finisher, and reduced the work hours of some of its other regular

Finishing employees. (Myers Aff. ¶¶ 15, 16; Noriega Aff. ¶ 9; Maher Aff. ¶¶ 8-13; Dep. of

Wanda Noriega at 45, 47.)  Accordingly, Myers notified BRC's worker's compensation carrier

that it should begin providing weekly Temporary Total Disability ("TTD") checks to Noriega.

(Myers Aff. ¶ 17.)  The TTD checks constituted 67% of her regular pay as an Injection Press

---

[4] Noriega was issued a Spanish version of BRC's employee handbook upon hire. (Noriega Dep. at 19-21.)

Operator and continued until July 14, 2003, the date Noriega was called back to work. (*Id.*)

Six weeks later, on July 14, 2003, BRC's business picked up, and Noriega was called back by BRC to resume her full-time light duty position in the Finishing area. (Noriega Aff. ¶¶ 11, 12; Myers Aff. ¶ 21.)  Regardless, on July 31, 2003, Noriega filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that BRC had discriminated against her based upon her race/national origin and her disability when it laid her off on June 2, even referring to it as a "termination" at one point in her Charge. (Noriega Aff. ¶ 16; Am. Compl., Ex. A.)  Nowhere in the Charge did Noriega indicate that she had already been called back to work by BRC. (Am. Compl., Ex. A.)

But things did not always go smoothly upon Noriega's return to work, as she perceived that her work performance was "frequently criticized" by BRC. (Am. Compl., Ex. C; Noriega Aff. ¶ 16.)  On or about August 7, 2003, just one week after filing her EEOC Charge, Noriega encountered problems with the machine she was working on and requested assistance from the Lead Process Technician, Theresa Chenery, and the maintenance department to resolve it. (*Id.*, Ex. C; Pl.'s Resp. Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp. Br."), Ex. C.)  She then was given a written disciplinary warning for failing to clean a mold properly, causing loss of production. (Am. Compl., Ex. C; Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), Ex. C.)  This constituted Noriega's second disciplinary warning, as she had received one in April 2003 due to an attendance infraction. (Pl.'s Resp., Ex. C.)

On August 15, 2003, Dr. Lazoff, a specialist to whom Noriega was referred by Dr. Rowe, removed Noriega's work restrictions, and she returned to her regular position as an Injection

Press Operator.[5] (Def.'s Mot. for Summ. J., Ex. 7; Noriega Aff. ¶ 12.)

On September 4, 2003, Noriega was given her third disciplinary warning, this time for producing bad parts. (Am. Compl., Ex. C; Pl.'s Resp., Ex. C.)  However, the warning was later rescinded after BRC learned that another employee actually created the problem with the press and that Noriega had not been fully trained in the correct way to run the job. (Am. Compl., Ex. C; Pl.'s Resp., Ex. C.)

A few days later, Noriega again encountered problems with her press and called maintenance for help. (Am. Compl., Ex. C.)  While the press was shut down for maintenance, Chenery directed Noriega to clean up her area; in doing so, Noriega put her food container on the table behind her station. (*Id.*)  Chenery immediately took the food container and threw it on the floor, criticizing Noriega for placing food on the table in the work area in violation of BRC's policy. (*Id.*)  Noriega then tried to explain to Chenery that the food container was placed on the table "only for a minute" while she was sweeping the floor. (*Id.*)  Having difficulty understanding Noriega, Chenery sought another employee's assistance, stating, "Can you translate Wanda's English, it's no good, I can't understand her." (*Id.*; Noriega Aff. ¶ 16; Noriega Dep. at 69-70.)  Noriega then went to Myers's office and complained that Chenery threw her food on the floor; Chenery later denied that she did so. (Am. Compl., Ex. C.)  In any event, from this incident, Noriega believed that Chenery criticized her English-speaking skills, although apparently she never communicated this concern to Myers. (*Id.*; Noriega Aff. ¶ 16; Myers Aff. ¶ 19; Noriega Dep. at 69-70.)

---

[5] While Noriega alleges in her amended complaint she has "permanent lifting restrictions," her allegation is not supported by any medical reports in the record. (*See* Am. Compl. ¶ 4; Def.'s Mot. for Summ. J., Exs. 7, 13.)

A few days after that incident, Urhausen "yelled" at Noriega for producing only nine heats in an hour, rather than the sixteen heats an employee is expected to produce on the machine she was working on that day. (Am. Compl., Ex. C.)  He then told her that "if she did not like it she could go home. . . ." (*Id*.)  Chenery then timed Noriega's production with a stopwatch. (*Id*.) Urhausen returned later and accused Noriega of turning in a sheet stating that she had only produced six heats in an hour; however, when Noriega adamantly denied ever producing that few in an hour and asked to see the written record, Urhausen abandoned the argument and walked off. (*Id*.)

On October 28, 2003, what would ultimately be Noriega's last day with BRC, Noriega timely reported for her shift and found that she was assigned to work a press which required two employees to operate. (Am. Compl., Ex. C; Noriega Dep. at 61-62.)  Her assigned partner for the press was Louis Castaneda, who was also of Hispanic national origin. (Am. Compl., Ex. C; Noriega Aff. ¶ 18; Noriega Dep. at 61-62.)  Castaneda, however, was not present at the start of the shift in order to operate the press with Noriega, thereby creating the risk that the press would go down and production would be lost. (Am. Compl., Ex. C; Urhausen Aff. ¶¶ 19, 20.) Approximately two minutes after the start of the shift, Castaneda reported to work, but not before Urhausen had learned of his tardiness. (Am. Compl., Ex. C; Urhausen Aff. ¶ 20; Noriega Dep. at 61-62.)  When Castaneda arrived at the press, Urhausen began yelling at him for being late, apparently because Castaneda had been issued several previous warnings for tardiness and Urhausen had told him that he "would not tolerate any further late arrivals." (Am. Compl., Ex. C; Urhausen Aff. ¶ 20; Noriega Aff. ¶ 18; Noriega Dep. at 61, 62.)  True to his word, Urhausen

fired Castaneda on the spot. (Urhausen Aff. ¶ 21.)

At some point during the heated interaction between Urhausen and Castaneda, Noriega interjected herself into the exchange and told Urhausen to move the discussion into his office, rather than at the press, because "he was screaming in her ears." (Am. Compl., Ex. C; Noriega Aff. ¶ 18; Noriega Dep. at 61-62.)  Noriega, believing that Castaneda had only been assessed three points to date under BRC's attendance policy, then tried to explain to Urhausen that an employee could only be terminated for absenteeism after accumulating thirteen points under the policy, not the three points she thought Castaneda had accumulated. (Am. Compl., Ex. C; Noriega Aff. ¶ 18.)  It is unclear how far Noriega got with this explanation because Urhausen told her to "shut up," began screaming at her as well, and ultimately fired her on the spot for insubordination.[6] (Am. Compl., Ex. C; Noriega Aff. ¶ 18; Urhausen Aff. ¶ 26; Noriega Dep. at 61-62.)

Noriega, after being fired by Urhausen, went to speak with Myers about the incident, and

_____

[6] While the Court must credit Noriega's version of the facts at this stage of the proceedings, *see Payne*, 337 F.3d at 770, BRC tells the events of Noriega's termination differently, relying upon reports that Urhausen, Myers, Chenery, and William Foote (Third Shift Press Room Supervisor) created promptly after the incident.  BRC claims that after learning of Castaneda's termination, Noriega abandoned her press without permission and went to Urhausen's office where Urhausen, Chenery, and Foote were gathered, and demanded to know why Castaneda had been terminated. (Urhausen Aff. ¶ 22; Aff. of Theresa Chenery ¶ 5; Aff. of William Foote ¶ 6; Def.'s Mot. for Summ. J., Exs. 31-33.)  While Noriega proceeded to advocate that Castaneda only had three points under the attendance policy and could not be terminated, Urhausen twice requested that Noriega return to her press, stating it was inappropriate to discuss issues pertaining to another employee. (Urhausen Aff. ¶¶ 23, 24; Chenery Aff. ¶¶ 5, 6; Foote Aff. ¶¶ 6, 7; Def.'s Mot. for Summ. J., Exs. 31-33.)  Noriega, however, failed to heed Urhausen's requests, causing him to give her a direct order to return to her press and warning her that she would be terminated if she did not comply. (Urhausen Aff. ¶ 25; Chenery Aff. ¶ 6; Foote Aff. ¶ 7; Def.'s Mot. for Summ. J., Exs. 31-33.)  She again continued to argue on Castaneda's behalf and said she was going to discuss the matter with Myers next, thereby further ignoring Urhausen's order to return to her press and extending the time the press was down. (Urhausen Aff. ¶ 26; Chenery Aff. ¶ 6; Foote Aff. ¶ 7; Def.'s Mot. for Summ. J., Exs. 31-33.)  It was at that point, after Noriega ignored Urhausen's multiple requests and direct orders to return to her press, that BRC reports Urhausen fired Noriega for insubordination. (Urhausen Aff. ¶¶ 36, 37.)

Urhausen followed. (Am. Compl., Ex. C; Urhausen Aff. ¶¶ 26-28; Myers Aff. ¶ 22.)  Urhausen

reported to Myers his basis for terminating Noriega, and Myers then relayed this information to

Noriega in Spanish and directed her to leave the premises. (Urhausen Aff. ¶ 28; Myers Aff. ¶

23.)  Per Myers's report, apparently at some point during the interchange in her office, while

Noriega was protesting her and Castaneda's termination, Noriega stated: "This is America and

we have rights." (Def.'s Mot. for Summ. J., Ex. 33.)  Other than this elusive statement, which

occurred *after* Noriega had been terminated, the record shows that Noriega opposed Castaneda's

termination solely on the basis of his having insufficient points for termination under the

attendance policy, never once mentioning Castaneda's national origin.

Procedurally, Noriega received a Notice of Suit Rights letter from the EEOC on

November 26, 2003. (Am. Compl., Ex. B.)  On February 2, 2004, she filed her original

complaint with this Court. (Docket # 1.)  Then on May 18, 2004, she filed a second Charge of

Discrimination with the EEOC, which incorporated the allegations in her first EEOC Charge and

additionally alleged that she was retaliated against after filing her first EEOC Charge. (Am.

Compl., Ex. C)  Accordingly, on December 10, 2004, she received a second Notice of Suit

Rights letter from the EEOC. (Am. Compl., Ex. D.)  On January 5, 2005, Noriega was granted

leave to amend her original complaint to include allegations of retaliation under Title VII.

(Docket # 22, 23.)

### III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of

material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court

9

"may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

Noriega alleges that BRC discriminated against her on the basis of her national origin and a disability when BRC temporarily laid her off, allegedly criticized her work performance, and then ultimately terminated her employment.[7] Noriega also claims that BRC retaliated against her after she complained about the alleged discrimination and used worker's compensation benefits. As will be seen, Noriega's Title VII and ADA claims cannot survive summary judgment as a matter of law.

---

[7] In her amended complaint, Noriega vaguely asserts that she was "harassed and discriminated against." (*See* Am. Compl. ¶ 9.) However, Noriega has not advanced a hostile work environment claim in her summary judgment response or sur-reply, and thus the Court deems Noriega to have abandoned this claim. *See, e.g., Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that arguments not presented to the court in a response to a summary judgment motion are deemed waived).

10

### A.  Noriega's Discrimination Claims Under Title VII and the ADA Fail

*1.  Noriega Fails to Show that She Was Discriminated*
*Against Because of Her National Origin*

A plaintiff alleging employment discrimination can contest summary judgment by using either the direct or indirect method of proof. *King v. Preferred Technical Group*, 166 F.3d 887, 891-92 (7th Cir. 1999).  The direct method requires the plaintiff to produce enough evidence, whether direct or circumstantial, *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994), to create a triable issue of whether the adverse employment action had a discriminatory motivation, *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997).[8]

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *E.g.*, *King*, 166 F.3d at 891-92.  Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  For Title VII claims, the *prima facie* case requires four showings: (1) the plaintiff was a member of a protected class; (2) the plaintiff was meeting the employer's legitimate expectations or was qualified for the job in question; (3) the plaintiff suffered an adverse employment action; and (4) similarly situated employees who were not members of the plaintiff's protected class were treated more favorably. *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995); *see also Davis v. Con-Way*

---

[8] Direct evidence is essentially "an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). In the absence of direct evidence, circumstantial evidence must compose "a convincing mosaic of discrimination against the plaintiff." *Troupe*, 20 F.3d at 737.  This circumstantial evidence is of three general types: (1) suspicious timing, ambiguous statements, or behavior toward other employees; (2) evidence that similarly situated employees were treated differently; or (3) evidence that the employee did not deserve termination and that the employer's reason for termination is a pretext for discrimination. *Volovsek v. Wis. Dep't of Agric., Trade and Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003).

11

*Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004).  If the plaintiff successfully

establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate,

nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S.

at 802.  Once the defendant has done so, the burden shifts back to the plaintiff to show that the

proffered reason is merely a pretext for discrimination. *Id.* at 804.

 In the instant case, Noriega has proffered no direct or circumstantial evidence of

discrimination with respect to the layoff, alleged criticism, or her termination supporting a claim

under the direct method of proof, and none is apparent from the record.  Therefore, the Court

will analyze Noriega's claims under the indirect method.

 With respect to each of the three events of alleged discrimination, Noriega consistently

trips over the fourth element in establishing a *prima facie* case of national origin discrimination –

that is, that similarly situated non-Hispanic persons received more favorable treatment than she

did.  To be similarly situated, two employees must have "dealt with the same supervisor, [been]

subject to the same standards, and . . . engaged in similar conduct without such differentiating or

mitigating circumstances as would distinguish their conduct or the employer's treatment of

them." *Radue*, 219 F.3d at 617-18.  It is indeed Noriega's burden as the plaintiff to identify an

employee and then demonstrate that he or she is similarly situated to her. *Peele v. Country Mut.

Ins. Co.*, 288 F.3d 319, 331 n.12 (7th Cir. 2002); *see also Patterson v. Avery Dennison Corp.*, 281

F.3d 676, 680 (7th Cir. 2002).

 Noriega fails across the board to identify with any specificity a similarly situated non-

Hispanic employee who was treated more favorably than her with respect to either the layoff, the

alleged criticism, or the termination; instead, she simply lobs vague references to other unidentified employees and then relies solely upon conclusory allegations in her affidavit and deposition, altogether failing to offer actual evidence in support of her claims. (*See* Noriega Aff. ¶¶ 15 ("I believed that there were two (2) other [females] in the finishing area who had less seniority than me but who were not laid off or fired . . . . but I do not know what their names were."),[9] 16 ("I saw that non-Hispanics and white workers seemed to get away with everything."); Noriega Dep. at 70-71 ("And one (1) guy, I think the name is, is Bosnia, he have one (1) accident and . . . [doesn't] get laid off.").)  In short, Noriega cannot just vaguely refer in her affidavit and deposition to unidentified non-Hispanic employees whom she claims were treated better than her to establish the fourth element of her *prima facie* case. *Ferguson v. Robert R. McCormick Tribune Found.*, 108 F. Supp. 2d 1033, 1039 (N.D. Ill. 2000) (emphasizing that plaintiff failed to establish the similarly situated element when she simply referred in her deposition testimony to unidentified African American employees and conclusory statements that African Americans were not disciplined like her); *Campbell v. Dominick's Finer Foods, Inc.*, 85 F. Supp. 2d 866, 872 (N.D. Ill. 2000) (granting summary judgment where plaintiff "never accurately identified" a proposed similarly situated individual nor offered evidence to substantiate that such individual was in fact similarly situated); *see generally Payne*, 337 F.3d at 773 (concluding that an affidavit must be based on personal knowledge, not mere speculation, and set forth specific facts).  "Absent evidence that these unidentified persons were similarly situated and engaged in materially similar []conduct, [a] [p]laintiff cannot survive summary

---

[9] Noriega later contradicts this assertion by agreeing in her deposition that the employees in Finishing who were retained all had more seniority than her. (*See* Noriega Dep. at 47; *see also* Def.'s Mot. for Summ. J., Ex. 27.)

judgment. . . ."[10] *Campbell*, 85 F. Supp. 2d at 872.  By neglecting to shoulder her burden with respect to this fourth element, Noriega fails to establish a *prima facie* case of national origin discrimination with respect to either the layoff, the alleged criticism, or her termination, and thus cannot survive BRC's motion for summary judgment on her claims of national origin discrimination.[11]

Moreover, even if Noriega had established a *prima facie* case of national origin

---

[10] BRC offers testimony that in the year prior, it experienced four accidents which resulted in injured employees being laid off or placed on worker's compensation leave (just like Noriega) and that none of these injured employees were of Hispanic national origin. (Myers Aff. ¶ 20.)

[11] Even if Noriega's temporary layoff was analyzed as a mini reduction in force (a "mini-RIF"), Noriega would still fail to establish the fourth element of her *prima facie* case with respect to her layoff.  In a mini-RIF, a single employee is discharged, and her position is not filled; rather, the employee's responsibilities are assumed by other employees. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000).  The mini-RIF doctrine would relieve Noriega from establishing that similarly situated employees received more favorable treatment, but it imposes the additional requirement that she show her job duties were absorbed by employees who are not members of the protected class (i.e., non-Hispanics). *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000); *see also Michas*, 209 F.3d at 693.  Noriega makes absolutely no effort to identify the employees who absorbed her job duties in the Finishing area, nor does she show that those employees are non-Hispanics.
Moreover, with respect to her claim arising from the alleged criticism, Noriega also fails to establish the third element of her *prima facie* case – that she experienced an adverse employment action.  Noriega claims that she was criticized more in her work because of her national origin; however, the criticism that she identifies (described in detail *supra* in Section II) actually only resulted in one written disciplinary warning to Noriega on August 7, 2003, for failing to clean a mold properly. (Pl.'s Resp. Br., Ex. C.)  Disciplinary warnings and negative performance evaluations do not rise to the level of an adverse employment action for purposes of Title VII, unless they "materially alter the terms and conditions of employment." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647-48 (7th Cir. 2005); *see also Haugerud v. Amery School Dist.*, 259 F.3d 678, 692 (7th Cir. 2002) (finding that plaintiff must show materially adverse change in the terms, conditions, or privileges of plaintiff's employment to support claim of adverse employment action).  While one might argue that each disciplinary warning brings a plaintiff closer to termination, such consequence is not inevitable, as "job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." *Whittaker*, 424 F.3d at 648 (internal quotation marks omitted).  Here, until her termination Noriega experienced no material change in the terms and conditions of her employment as a result of the alleged criticism and thus fails to establish the second element of her *prima facie* case with respect to such events.
Furthermore, with respect to the second element of Noriega's claim arising from her termination, Noriega has made no effort to produce evidence to oppose BRC's contention that she was not meeting its legitimate expectations at the time of her discharge.  Within her first year of employment with BRC, Noriega received two disciplinary warnings, one for attendance in April 2003 and the other for failing to clean a mold properly in August 2003.  Thus Noriega did not have a spotless employment record at the time she unwisely launched an attack on her direct superior concerning his decision to terminate Castaneda. *See generally Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 452-53 (7th Cir. 1998) (holding that plaintiff failed to establish he was meeting employer's legitimate expectations at time of termination because of numerous prior violations of employer's policies by plaintiff).

14

discrimination, BRC has articulated a legitimate, nondiscriminatory reason for the adverse

employment actions that Noriega experienced.  With respect to laying off Noriega, BRC

encountered a shortage of work in the Finishing area where Noriega had been assigned for light

duty, causing it to implement a temporary reduction in force.  BRC followed the procedure

articulated in its employee manual for such reductions, which is based upon employees' seniority

within a department, and temporarily laid off Noriega because she had the least seniority within

the Finishing area.  BRC then temporarily reduced the hours of its other Finishing employees

who had more seniority than Noriega.

Likewise, BRC also articulated a legitimate, nondiscriminatory reason for discharging

Noriega when it did.  Urhausen apparently thought that Noriega's interjection into his fracas

with Castaneda and her directive to him to leave was an act of insubordination.  After all, like

most factory supervisors, Urhausen was probably not accustomed to taking orders from a line

worker.        Since BRC articulated a legitimate, nondiscriminatory reason for Noriega's layoff

and later termination, the burden shifts to Noriega to provide evidence that her layoff and

termination by BRC were pretextual. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1014 (7th

Cir. 2000).  As long as BRC honestly believed its reasons for its actions taken toward Noriega,

i.e., that she had the least seniority in the Finishing area and that she was insubordinate to

Urhausen, pretext has not been shown, even if BRC's decisions were mistaken, ill-considered, or

foolish. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 772 (7th Cir. 2002); *see also Ajayi v.

Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003) (articulating that "courts do not sit as

super personnel departments, second-guessing an employer's facially legitimate business

decisions").

Here, Noriega absolutely fails to show evidence of pretext, as she has produced nothing which suggests that BRC's proffered reason of insubordination is factually baseless, was not the actual motivation for her discharge, or was insufficient to motivate the discharge. *Nawrot*, 277 F.3d at 906.  Noriega's lone assertion that she "was not trying to be insubordinate" to Urhausen simply does not raise an issue of fact. (Noriega Aff. ¶ 18.)  Urhausen had a reasonable belief that Noriega had acted toward him in an insubordinate manner and that is all that is required. *See Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir. 1987) ("A reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination.").

In summary, "[s]ummary judgment is designed to head off a trial if the opposing party does not have a reasonable prospect of prevailing before a reasonable jury – that is, a jury that will base its decision on facts and the law, rather than on sympathy or antipathy or private notions of justice." *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 338 (7th Cir. 1991) (internal quotation marks omitted).  While it is very clear that Noriega "thinks" and "feels" she has been discriminated against by BRC based on her Hispanic national origin (*see* Noriega Aff. ¶ 16), it is just as clear that she simply has failed as a matter of law to produce actual evidence to substantiate her claims of discrimination. *See Walker v. Abbott Labs.*, 416 F.3d 641, 645 (7th Cir. 2005) (granting summary judgment in an employment discrimination case because no reasonable jury confronting the record presented by the plaintiff could conclude that the alleged discrimination occurred).  Accordingly, BRC's motion for summary judgment will be granted

with respect to Noriega's claims of national origin discrimination.[12]

## 2. Noriega Fails to Show That She Was Discriminated
## Against Because of a Disability

In addition to her claims of national origin discrimination, Noriega alleges that BRC discriminated against her under the ADA by failing to accommodate her disability and treat her the same as similarly situated individuals who did not experience an injury. To be successful on any of these claims, Noriega must first show that she is indeed disabled, as that term is defined by the ADA, as a result of her back injury and thus entitled to ADA protection. It is at this threshold hurdle where Noriega stumbles, causing all of her ADA claims to instantly fail.

## a. Noriega's Back Strain Does Not Rise to the
## Level of a Disability Under the ADA

The ADA does not protect a plaintiff at all unless she can prove she is a "qualified individual with a disability," *Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998), defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." 42 U.S.C. § 12111(8). The inquiry into whether a plaintiff is disabled under the ADA "is an individual one, and must be determined on a case-by-case basis." *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995). A "disability" under the ADA, with respect to an individual, is defined as (1) a physical or mental impairment that substantially

---

[12] In addition, BRC is entitled to summary judgment on Noriega's claim of national origin discrimination under 42 U.S.C. § 1981. Noriega was an at-will employee; the Court does not need to delve into whether at-will employment rises to the level of a contractual relationship, an element necessary to support a Section 1981 claim, because even if it did, Noriega's claim would fail for the same reasons as her Title VII claim. *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1033-35 (7th Cir. 1998). The same standards governing liability under Title VII also apply to Section 1981. *Id.*

limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2); *DePaoli v. Abbott Labs.*, 140 F.3d 668, 671 (7th Cir. 1998). "It is not enough to show minor inconvenience; the [ADA] specifically requires a plaintiff to show that he or she is 'substantially limited' with respect to the activity in question." *Dalton v. Subaru-Isuzu Auto., Inc.*,141 F.3d 667, 675 (7th Cir. 1998).  In determining whether an individual is substantially limited in a major life activity, a court must consider: "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Toyota Motor Mfg., Ky., Inc., v. Williams*, 534 U.S. 184, 196 (2002).

Here, Noriega claims that her May 14, 2003, work-related back strain rises to the level of a "disability" under the ADA, spending a great deal of time arguing in her briefs that it substantially limited her performance of major life activities.  She asserts that after her injury she was not only placed on work restrictions, but also faced limitations in performing her major life activities outside of work as well. (Noriega Aff. ¶ 5.)  More specifically, she states that she experienced decreased energy, was no longer able to run, was dependent on the help of her family to complete her housework, and was limited in her ability to interact and play with her children. (*Id.*)

Nonetheless, while Noriega undoubtedly faced certain limitations after her injury, she was released by her physician *just three months after* her injury to return to her normal work duties with absolutely no restrictions. (Def.'s Mot. for Summ. J., Ex. 7.)  In fact, Noriega concedes in

her briefs that any limitations she experienced at work and at home were not permanent, but were temporary in nature persisting *only three to five months*.[13] (Pl.'s Resp. Br. at 3, 4, 6; Pl.'s Sur-Reply to Def.'s Reply to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. at 2.)

Contrary to Noriega's assertions, the ADA does not protect the temporarily disabled. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197 (7th Cir. 1997); *see Toyota,* 534 U.S. at 198 ("The impairment's impact must . . . be permanent or long term); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995) ("Intermittent, episodic impairments are not disabilities, the standard example being a broken leg").  In *Heimann v. Roadway Express, Inc.*, 228 F. Supp. 2d 886, 907 (N.D. Ill. 2002), the court held that the plaintiff, a truck driver pursuing a failure to accommodate claim, was not entitled to the protection of the ADA when he suffered from carpel tunnel syndrome during a four-month period before his employer accommodated his need to drive only trucks with power steering.  The court concluded that his "condition was clearly temporary" during that four-month period as plaintiff's physician expected that plaintiff could return to full duty work within six to eight weeks following corrective surgery and "no one, including [p]laintiff's physicians knew that his condition was anything other than temporary." *Id*. at 900; *see also Matthews*, 128 F.3d at 1197 (finding that plaintiff who was off of work for six months due to a heart attack was only temporarily disabled and thus not protected by the ADA); *Hawrych v. Custom Plastics, Inc.*, No. 98 C 4848, 2000 WL

---

[13] In her affidavit, Noriega states, "I still have pain from my back injury"; however, she further testifies that the limitations arising from her back strain persisted only four to five months after her injury. (Noriega Aff. ¶ 5.) Based on this testimony, the Court has no basis to infer that the back pain Noriega experiences limits her performance of any major life activity. *See Chapple v. Nat'l Starch & Chem. Co. and Oil*, 178 F.3d 501, 504 (7th Cir. 1999) (explaining that in determining whether a genuine issue of material fact exists, the Court need draw only reasonable inferences in favor of the non-moving party, not every conceivable inference).

33121063, at *2 (N.D. Ill. June 5, 2000) (concluding that plaintiff who experienced temporary knee injury was not protected by the ADA because "disability does not include temporal medical conditions"). Noriega simply fails to offer any evidence that indicates her back strain, as well as any alleged limitations in major life activities she experienced from it, was anything more than a temporary condition of four to five months duration, a condition clearly failing to rise to the level of a disability under the ADA.[14]

Moreover, Noriega fails to provide evidence that BRC in any way perceived Noriega as disabled at the time of her termination. At the time Urhausen terminated Noriega, she had already been back to full duty work for over two months with absolutely no work restrictions. Due to BRC's privacy policies, Urhausen did not even have knowledge of Noriega's medical history, other than that she had been under work restrictions for a short period of time due to a back strain. (Urhausen Aff. ¶¶ 30-32.) In fact, Urhausen and Myers each articulated in their affidavits that they did not perceive Noriega as disabled at the time of her termination (*See id.*; Myers Aff. ¶ 28), and Noriega has failed to produce any evidence which suggests otherwise.

Therefore, based on the record presented, no reasonable jury could find that Noriega was a "qualified individual with a disability" to bring her within the protection of the ADA. *See Walker*,

---

[14] Furthermore, the limitations in major life activities outside of work that Noriega alleges she experienced for four to five months would arguably not even be considered "substantial." *See Toyota*, 534 U.S. at 202 (concluding that plaintiff's impairment, which caused her to avoid sweeping, to quit dancing, to occasionally require help with dressing, and to decrease her frequency of driving long distances, gardening, and playing with her children, "did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives that they establish a manual task disability as a matter of law"). Likewise, Noriega could hardly be considered substantially limited in her major life activity of working when she returned to full duty work just three months after her injury with absolutely no restrictions, not even attempting to argue that she was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1017 (7th Cir. 2001).

416 F.3d at 645; *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1573 (7th Cir. 1989) (affirming

summary judgment when evidence was so one-sided that a trial would be "an exercise in futility

for the plaintiff").  Accordingly, all of Noriega's ADA claims collapse as a matter of law.

> b.  Even if Noriega's Back Strain Did Constitute a Disability, Noriega
>      Fails to Establish a *Prima Facie* Case of Disability Discrimination

Assuming *arguendo* that Noriega was a "qualified individual with a disability" under the

ADA, Noriega's claim that BRC treated her less favorably than other non-disabled employees

would still fail.  Discrimination claims under the ADA are subject to the standard analysis

articulated *supra* in Section IV(A)(1) used in most employment discrimination cases, wherein the

plaintiff can contest summary judgment by using either the direct or indirect method of proof. *See*

*King*, 166 F.3d at 891-92.  Noriega has not proffered any direct or circumstantial evidence of

disability discrimination; therefore, the Court will analyze her claim under the indirect method.

Here, Noriega's claim of discrimination under the ADA quickly achieves the same fate as

her national origin discrimination claims under Title VII.  She again fails to identify with any

specificity a similarly situated person who was not disabled and received more favorable

treatment than she did with respect to her layoff or termination; instead, she simply makes

conclusory, unsupported allegations that non-disabled persons were treated better than her. (*See*

Noriega Aff. ¶ 15 ("I believed that there were two (2) other [females] in the finishing area who

had less seniority than me but who were not laid off or fired . . . . but I do not know what their

names were.").)[15]  Therefore, just as with her national origin discrimination claim, Noriega fails to

---

[15] Noriega's claim of disability discrimination fails under a mini-RIF analysis as well. *See supra* note 11.

establish the fourth element of her *prima facie* case of disability discrimination.

Even if Noriega had established a *prima facie* case of disability discrimination, BRC has articulated a legitimate, nondiscriminatory reason for her layoff (*i.e.*, least seniority) and termination (*i.e.*, insubordination).  In response, Noriega fails to produce evidence that BRC's reasons are pretextual, simply speculating in her affidavit: "I think that my employer first told me there was no work for me in the summer of 2003, because they were mad at me for getting hurt at work . . . . I also feel like while I was working for [BRC], that I was . . . treated unfairly . . . because I was disabled for a period of time due to my back injury." (Noriega Aff. ¶ 17.)  However, mere speculation of pretext through conclusory, unsupported conclusions in a self-serving affidavit is simply insufficient to prevent summary judgment. *See Grube v. Lau Indus., Ind.,* 257 F.3d 723, 730 (7th Cir. 2001).  Furthermore, as to Noriega's layoff, an employer is "not required [under the ADA] to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).  Moreover, to further cut against Noriega's arguments arising from her discharge, Castaneda, who was not injured, was terminated at the same time as Noriega, and, as discussed *supra*, Urhausen was not privy to Noriega's medical history but was only aware that she had previously been under work restrictions for a short period of time.  Therefore, just as with her Title VII discrimination claims, Noriega fails to produce any evidence that BRC's reasons were pretextual when it laid her off and later terminated her employment.

In summary, Noriega's claims of discrimination under the ADA are just as unsuccessful as her discrimination claims asserted under Title VII.  While again Noriega may "think" and "feel"

(*see* Noriega Aff. ¶ 16) that she has been discriminated against by BRC because of a "disability," no reasonable jury confronting the evidence presented by Noriega could conclude as a matter of law that the alleged disability discrimination occurred. *See Walker*, 416 F.3d at 645.  Therefore, BRC's motion for summary judgment will be granted with respect to all of Noriega's claims of discrimination.

### B.  Noriega's Retaliation Claims Under Title VII and the ADA Fail

In addition to her claims of discrimination, Noriega also alleges two incidents of retaliation by BRC: (1) alleged criticism of her work; and (2) the termination of her employment. (Am. Compl., Ex. C.)  Retaliation claims, like other discrimination claims, follow the *McDonnell Douglas* model as clarified by the Seventh Circuit in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 641, 644 (7ᵗʰ Cir. 2002).  First, the plaintiff must establish a *prima facie* case by showing that (1) after engaging in protected activity; (2) only she, and not any similarly situated employee who did not file a charge; (3) was subjected to an adverse employment action; (4) even though she was performing her job in a satisfactory manner. *Id.*  If this case is made, the defendant must proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.*  The burden then falls on the plaintiff to show that the proffered reason is pretextual. *Id.*

As to her contention that she was retaliated against by BRC's alleged criticism of her performance, Noriega fails to establish the third element of her *prima facie* case – that the criticism constituted an adverse employment action.  As discussed *supra* in footnote 11 of Section IV(A)(1), the disciplinary warnings and reprimands that Noriega received did not "materially alter the terms and conditions of [her] employment" and thus fail to rise to the level of an adverse

employment action under Title VII. *Whittaker*, 424 F.3d at 647-48; *see also Haugerud*, 259 F.3d at 692. Furthermore, Noriega's argument that all employees of Hispanic national origin also allegedly experienced frequent criticism serves to undercut her claim of retaliation, as obviously many of these Hispanic employees had not filed a charge of discrimination.

Likewise, with respect to Noriega's discharge, BRC's simultaneous termination of Castaneda, who based on the record never filed a charge or complained of either national origin or disability discrimination, causes Noriega to falter on the second element – that only Noriega, and not any other similarly situated employee, experienced the adverse employment action.[16] Therefore, Noriega also falls short of establishing a *prima facie* case of retaliation with respect to her termination.

Assuming *arguendo* that Noriega was able to establish a *prima facie* case in connection with her termination, Noriega's retaliation claim would still fail for lack of pretext. As discussed *supra*, BRC has articulated a legitimate, nondiscriminatory reason for Noriega's termination (*i.e.*, insubordination), and Noriega has failed to show that it was pretextual. Moreover, Noriega has not provided any evidence that indicates Urhausen was even aware of her charge of discrimination filed with the EEOC. *Maarouf v. Walker Mfg. Co., a Div. of Tenneco Auto., Inc.*,

---

[16] Furthermore, in her exchange with Urhausen on October 28 preceding her termination, Noriega never opposed Castaneda's termination on the basis of Castaneda's Hispanic national origin; rather, she solely argued that Castaneda had not accumulated enough points to warrant termination under BRC's attendance policy. Her only statement that could at all point to advocacy based on national origin was directed to Myers *after* she had already been fired by Urhausen: "This is America and we have rights." (Def.'s Mot. for Summ. J., Ex. 33.) Therefore, no retaliation charge can be linked to her attempt to advocate for Castaneda on her final day at BRC. *See Stone,* 281 F.3d at 642; *Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) ("An employer cannot retaliate if there is nothing for it to retaliate against."). This leaves Noriega hinging her retaliation claim solely on the EEOC charge she filed three months earlier; however, a gap of three months between filing an EEOC charge and an adverse employment action with nothing more, is insufficient to support a claim of retaliation. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000).

210 F.3d 750, 755 (7th Cir. 2000) (holding that retaliation was not proven where plaintiff failed to show that decision maker was aware of the complaint).  Accordingly, as no reasonable jury could conclude that the alleged retaliation occurred as a matter of law, *see Walker*, 416 F.3d at 645, BRC is entitled to summary judgment on Noriega's claims of retaliation.[17]

### C.  Noriega's *Frampton* Retaliation Claim Will Be Dismissed Without Prejudice

When all federal claims drop out of a case before trial, the general rule is that the district court should relinquish jurisdiction over the supplemental claims, especially when there has been little discovery or other pretrial preparation. *See* 28 U.S.C. § 1367; *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997).  Here, the Title VII and ADA claims created federal jurisdiction; therefore, the Court will dismiss without prejudice Noriega's remaining state *Frampton* claim so that Noriega may pursue it, if she so desires, in state court. *See generally Frampton v. Cent. Ind. Gas Co.*, 297 N.E.2d 425 (Ind. 1973).

### V.  CONCLUSION

For the reasons given above, Defendant's motion for summary judgment (Docket # 30) is GRANTED with respect to all of Plaintiff's federal claims.  The Clerk is directed to enter a judgment in favor of Defendant and against Plaintiff on all claims, with the exception Plaintiff's state *Frampton* claim, which is dismissed without prejudice.

Enter for this 22nd day of November, 2005.

---

[17] In addition, BRC is entitled to summary judgment on Noriega's claims of retaliation under 42 U.S.C. § 1981. *See supra* note 12.

25

/S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge